ALBERT J. BORO, JR. (CA Bar #126657)
*ajboro@boro-law.com*
BORO LAW FIRM
345 Franklin Street
San Francisco, CA 94102
Telephone: (415) 621-2400
Facsimile: (415) 276-5870

Attorney for Defendant
EBIN ROSALES-JIMENEZ

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

EBIN ROSALES-JIMENEZ,

Defendant.

No. 22-cr-00355-JST-1

DEFENDANT EBIN ROSALES-JIMENEZ'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE IN SENTENCING

Date: May 2, 2025
Time: 9:30 a.m.
Court: Hon. Jon S. Tigar

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ i

I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 2

A. Mr. Rosales-Jimenez's Personal History. ........ 2

B. A Summary of the Incidents Charged in the Superseding Information. ........ 4

III. SENTENCING GUIDELINES CALCULATION ........ 6

IV. MOTION FOR DOWNWARD VARIANCE IN SENTENCING AND RECOMMENDATION OF SENTENCE OF 24 MONTHS' CUSTODY ........ 6

A. The Nature and Circumstances of the Offense Support a Downward Variance. ........ 7

B. Considerations of the Seriousness of the Offense, Respect for the Law, and the Need for Deterrence and to Protect the Public from Further Crimes Support a Downward Variance. ........ 8

C. Considerations of Avoiding Unwarranted Sentencing Disparities Support the Requested Sentence of 24 Months' Custody. ........ 9

D. Mr. Rosales-Jimenez's Personal History of Poverty and Abandonment, and His Victimization, Substance Abuse, and Youthfulness, and His Good Character, All Support a Significant Downward Variance. ........ 12

V. CONCLUSION ........ 15

## I. INTRODUCTION

Defendant Ebin Rosales-Jimenez respectfully submits this Sentencing Memorandum and Motion for a Downward Variance in Sentencing for his upcoming sentencing. A consideration of the Section 3553(a) factors leads to a conclusion that "a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing," is 24 months' custody. *See* 18 U.S.C. § 3553(a). Mr. Rosales-Jimenez's co-defendant and co-conspirator in the charged conspiracy received a sentence of 24 months for the same basic conduct, yet the Government requests the Court sentence Mr. Rosales-Jimenez to 42 months' custody, 75% longer. If the Court were to sentence Mr. Rosales-Jimenez to a longer sentence than his co-defendant, it should not exceed Probation's recommendation of 32 months. Considerations of avoiding unwarranted sentencing disparities, as well as Mr. Rosales-Jimenez's personal history and characteristics, including his abandonment as a child and growing up in poverty, his being a victim of violent gang crime, his working in the fields at the age of 6 and only having a fourth-grade education, his youthfulness at the time of the offenses, and his substance abuse issues all support a significant downward variance.

The Court is all too familiar with crimes similar to those charged here: drug dealing, including fentanyl, by persons, including undocumented immigrants from Central America, such as Mr. Rosales-Jimenez, a citizen of Honduras. The Government recognizes in its Sentencing Memorandum that persons selling drugs, like Mr. Rosales-Jimenez, did not "create[] the fentanyl epidemic," but views him as profiting from it. Gov. Sentencing Memo. at 5, filed April 25, 2025 (Dkt. #81). Yet the real world factors leading to Mr. Rosales-Jimenez's offenses are more complicated.

The discovery produced by the Government showed that Mr. Rosales-Jimenez was homeless in the San Francisco Bay Area, staying at residences where other undocumented Central Americans were sleeping. Mr. Rosales-Jimenez was identified as sleeping at a house on 83rd Avenue in Oakland with 11 other Hispanic men, including Mr. Rosales-Jimenez's co-defendant in this case. *See* Presentence Investigation Report for E. Rosales-Jimenez, at ¶ 8, filed April 18, 2025 (Dkt. #80) ("PSR"); US-600758, at 600759-0761 (DEA Report of Investigation, dated June 3, 2022).[1] A variety of controlled substances, including fentanyl, were found there when the Government raided the house

[1] The Government produced this DEA Report of Investigation in discovery, and the defense does not believe there is any dispute over the contents of it or the other discovery documents cited in this Sentencing Memorandum, but Mr. Rosales-Jimenez can provide the Court copies of the cited discovery documents, if it wishes to review them.

to arrest a drug dealer who had been using telephone number (970) 575-2286. *Id.* During surveillance for the August 2022 undercover drug buys, Mr. Rosales-Jimenez and his co-defendant were seen staying at an apartment on Loma Vista Avenue in Oakland, where other people were observed coming and going. *See* US-0000054, at US-0000054-0057 (DEA Report of Investigation, dated Aug. 8, 2022); US-0000108, at US-0000108-0111 (DEA Report of Investigation, dated Aug. 30, 2022). And he and his co-defendant were seen driving a silver BMW sedan to some of the drug sales. *Id.*

Mr. Rosales-Jimenez did not create the fentanyl crisis as the Government concedes. He did not create the conditions of people with mental health and addiction issues left unhoused on the streets, or the mass marketing of opioids that led to the fentanyl crisis Being homeless in the San Francisco Bay Area and having little money, he also obviously did not rent the house on 83rd Avenue or the apartment on Loma Vista Avenue or purchase or lease the silver BMW or subscribe for the cell phone number (970) 575-2286. Much like the abandoned youth sent out to pick pockets in Oliver Twist, Mr. Rosales-Jimenez and others like him, are sent out to sell drugs for others. This does not excuse his conduct but should help put it in context of the greater fentanyl crisis, and it warrants that he not be judged more harshly than his co-defendant who received a 24-month sentence.

## II. STATEMENT OF FACTS

### A. Mr. Rosales-Jimenez's Personal History.

Mr. Rosales-Jimenez was only 22 when the incidents charged in the Indictment occurred. He is 25-years old now. He grew up in Agua Caliente, a poor village in the Department of Francisco Morazán in Honduras. PSR ¶ 40. He only attended school through the fourth grade. *Id.* ¶ 53. He remembers often waking up hungry with nothing to eat. *Id.* ¶ 42.

His biological father was an alcoholic who abused his mother. *Id.* Due to this unstable household and the lack of money, his parents abandoned him and his two younger brothers when he was 6-years old. *Id.* A couple in his town took the three children in and provided them a place to sleep and food in exchange for assisting the husband in the fields with agricultural work. *Id.* He started working at 6-years old, milking cows, clearing fields, and harvesting produce, such as corn. *Id.* ¶ 43. The Maras gang operated in the areas around his hometown and terrorized residents, stealing merchandize and supplies, extorting money, and committing acts of violence, including

murder. *Id.* ¶ 44. He witnessed the effects of this violence. *Id.* Mr. Rosales-Jimenez had to leave to work in a nearby town when he heard that the gang was looking for him to recruit him. *Id.*

At about the age of 16, he began trying to immigrate to the United States to get work in order to obtain money for himself and support his brothers and adoptive parents, who are still in Honduras. He came to the United States in 2016, at the age of 16, and was arrested in Arizona soon after crossing the border. PSR ¶ 41. He tried to come to the United States a second time in 2018, at the age of 18. During this journey, he was kidnapped in Mexico, but when the criminals learned he had no family to pay a ransom, they tortured him, cutting off the tips of two of his fingers and stabbing him in the knee with a metal rod, and left him for dead. *Id.* He was found by a Mexican woman and spent weeks recovering. *Id.* He went back to Honduras, and then tried again to immigrate to the United States with friends from his village, but was again arrested in Arizona, soon after crossing the border. *Id.*

He immigrated to the United States for a third time in 2020, at the age of 20. PSR ¶ 41. He first went to Las Vegas, with some other Mexican and Honduran immigrants, who told him there were jobs waiting for them there. *Id.* They had lied, and he had nowhere to sleep, no consistent work, and began using drugs. He had heard there were jobs available in Utah and traveled there, and worked in construction (and later at a warehouse shipping facility). *Id.* ¶ 54. Through the occupants of one house he worked on, he met Catherine Flores. *Id.* ¶ 46. She found out he had nowhere to sleep on a regular basis, and she invited him to move into her home, and became his Utah adoptive mother. *Id.* He later became engaged to Ms. Flores's niece, Angelica Herrera, and they have a one-year old son together. *Id.* Mr. Rosales-Jimenez went to San Francisco in 2022 because he was told there were jobs available that paid well, but when he arrived, there was no job waiting for him and he had no money to return to Utah. He was offered "work" by the " 'wrong friends,' " and they introduced him to selling drugs. *See id.* ¶ 16. In September 2022, he left San Francisco and returned to Utah where he resided with his adopted family until his arrest in January 2024. *See id.* ¶ 6.

**B. A Summary of the Incidents Charged in the Superseding Information.**

Mr. Rosales-Jimenez was originally charged in an Indictment with one co-defendant that was filed on September 15, 2022. (Dkt. # 1.) His co-defendant pleaded guilty to conspiracy and drug distribution and has been sentenced. Judgment, filed Apr. 8, 2024 (Dkt. #58). On September 19, 2024, the Government filed a Superseding Information against Mr. Rosales-Jimenez with four drug offenses. (Dkt. #65.) On January 24, 2025, he pleaded guilty to all four Counts in the Superseding Information. Plea Agreement of E. Rosales-Jimenez, filed Jan. 24, 2025, at ¶ 1 (Dkt. #79). Mr. Rosales-Jimenez admitted to participating in a conspiracy to distribute and possession with intent to distribute fentanyl from June 7, 2022 to September 15, 2022 (Count One), 21 U.S.C. §§ 846, 841(a)(1) & (b)(1)(C); distribution of fentanyl on June 7, 2022 and August 25, 2022 (Counts Two & Three), 21 U.S.C. §§ 841(a)(1) & (b)(1)(C); and distribution of methamphetamine on August 25, 2022 (Count Four), 21 U.S.C. §§ 841(a)(1) & (b)(1)(C). Plea Agreement ¶ 1. He accepted responsibility for the fentanyl sold by him and his co-defendant, which totaled 277.188 grams, and 28.623 grams of methamphetamine that he sold. *Id.* ¶ 2.

Mr. Rosales-Jimenez admitted in his Plea Agreement that he conspired to distribute fentanyl with his co-defendant. *Id.* ¶ 2. He admitted that they assisted each other with sales of fentanyl. *Id.* He further admitted that the two sales of fentanyl by his co-defendant to the undercover agent ("UC") were within the scope of the agreement to possess and distribute fentanyl and were reasonably foreseeable to him as a natural consequence of and in furtherance of the conspiracy. *Id.* As recounted in the PSR, Mr. Rosales-Jimenez sold fentanyl to the UC on June 7, 2022 and August 25, 2022, and his co-defendant sold fentanyl to the UC on June 30, 2022 and August 4, 2022. PSR ¶¶ 9-12.

On June 7, 2022, Mr. Rosales-Jimenez sold 110.8 grams of fentanyl to the UC in Oakland, California. The fentanyl sale and location were arranged via text messages to the telephone number (970) 575-2286, and Mr. Rosales-Jiminez showed up at the pre-arranged location. PSR ¶ 9; Plea Agreement ¶ 2. Unlike the text message exchanges for the next three sales to the UC, the text message exchange on June 6 and 7, 2022 was in English and not Spanish. PSR ¶ 9. Mr. Rosales-Jimenez cannot read and write in English. *Id.* ¶ 53.

On June 30, 2022, the co-defendant met with the UC at a location arranged via text messages (again to the telephone number (970) 575-2286, but this time in the Spanish language), and sold two ounces of fentanyl to the UC. *Id.* ¶ 10. When the co-defendant showed up, the UC asked the co-defendant where his other amigo was (the friend who previously sold him fentanyl was on June 7, Mr. Rosales-Jimenez), and he responded that he was at home. *Id.* During the sale, the co-defendant showed the UC methamphetamine and heroin he had in a small bag, and offered to sell the drugs to the UC. *Id.* When the UC inquired about the price, the co-defendant called the telephone number (970) 575-2286 to discuss the price, but the UC declined to purchase those drugs. *Id.* The Government claims he spoke with Mr. Rosales-Jimenez but there is no proof who was on the telephone with the co-defendant. *Id.* On August 4, 2022, the co-defendant met with the UC at a location arranged via text messages with the telephone number (970) 575-2286 in the Spanish language, and again sold two ounces of fentanyl. *Id.* ¶ 11.

On August 25, 2022, Mr. Rosales-Jimenex met with the UC and sold him an ounce of fentanyl and an ounce of methamphetamine. PSR ¶ 12. The UC arranged to meet in Oakland via text messages to the telephone number (970) 575-2286. *Id.* Both Mr. Rosales-Jimenez and his co-defendant were at the pre-arranged location when the UC arrived, and Mr. Rosales-Jiminez got in the UC's vehicle and exchanged the drugs for cash. *Id.* Following the transaction, an agent called the telephone number (970) 575-2286 while he observed Mr. Rosales-Jimenez and his co-defendant standing together, and he spoke with a male on the telephone, but he observed that neither Mr. Rosales-Jimenez nor his co-defendant were speaking on a cell phone. *Id.*

On about September 15, 2022, Mr. Rosales-Jimenez left the San Francisco Bay Area and returned to Utah. His co-defendant left the San Francisco Bay Area and was arrested on October 19, 2022 in Denver, Colorado with two phones, one of which was the cell phone with the telephone number (970) 575-2286.[2] Mr. Rosales-Jimenez was arrested in Utah on January 24, 2024 for an alleged sale of pills containing fentanyl, and state authorities transferred him to the custody of

[2] The DEA Report of Investigation, dated Oct. 26, 2022, documents that the co-defendant was located alone in Denver (and was under observation by the agents for over an hour playing soccer) with the cell phone with number (970) 575-2286. US-0001004-1008.

Immigration and Customs enforcement on February 1, 2022, who delivered him to the U.S. Marshal pursuant to the arrest warrant issued in this case. PSR ¶¶ 6 & 38.

## III. SENTENCING GUIDELINES CALCULATION

Mr. Rosales-Jimenez agrees with the Sentencing Guidelines calculation in the Plea Agreement (paragraph 7) and the PSR (paragraphs 17 to 28):

1. Base Offense Level (at least 1,000 KG but less than 3,000 KG CDW): **30**
   (U.S.S.G. § 2D1.1(a)(5) & (c)(5))
2. Acceptance of Responsibility: **-3**
   (U.S.S.G. § 3E1.1(a) & (b))
3. Zero-Point Offender: **-2**
   (U.S.S.G. § 4C1.1)
4. Total Offense Level: **25**

In his Plea Agreement, Mr. Rosales-Jimenez took responsibility for the fentanyl he sold on two occasions, as well as the fentanyl sold by his co-defendant on two occasions, for a total of 277.188 grams, and the methamphetamine he sold on one occasion, which was 28.623 grams. The Converted Drug Weight for the combined quantity of drugs is 1,265.43 kilograms, which is Base Offense Level 30. *See* PSR ¶ 19.

Mr. Rosales-Jimenez agrees with the PSR that he has zero criminal history points and is a Criminal History Category I. PSR ¶ 32. Because he has no criminal history points and meets the other criteria, he is a Zero-Point Offender and receives a 2-level reduction in the offense level. *Id.* ¶ 27; *see* U.S.S.G. § 4C1.1. The resulting recommended sentencing range for an Offense Level of 25 and CHC I is 57 to 71 months under the Guidelines.

## IV. MOTION FOR DOWNWARD VARIANCE IN SENTENCING AND RECOMMENDATION OF SENTENCE OF 24 MONTHS' CUSTODY.

Section 3553(a) directs the Court to " 'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing." 18 U.S.C. § 3553(a); *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam)

(emphasis in original). A consideration of the 3553(a) sentencing factors demonstrates that a sentence sufficient, but not greater than necessary, to meet sentencing goals is 24 months' custody. It is certainly not a sentence exceeding the 32 months recommended by Probation.

The Court previously determined in sentencing Mr. Rosales-Jimenez's co-defendant and co-conspirator that a 24-month sentence was appropriate for the same drug sales at issue in this case. PSR ¶ 5. Probation has recommended a 32-month sentence, but does not address the sentencing disparities caused by his co-defendants' prior 24-month sentence. *See* PSR Sentencing Recommendation at ECF pp. 20-22. The Government recommends a below-Guidelines sentence of 42 months but does not address Probation's recommendation of a sentence that is 10 months shorter. Gov. Sentencing Memo. at 6.

All parties agree a downward variance is appropriate in this case. The Government acknowledges that Mr. Rosales-Jimenez "grew up in poverty in Honduras and was kidnapped by members of the cartel where he was beaten and ultimately hospitalized." Gov. Sentencing Memo. at 6. The PSR goes into greater detail of the hardships that Mr. Rosales-Jimenez has endured. PSR ¶¶ 40-44; PSR Sentencing Recommendation at ECF p. 21. An analysis of the Section 3553(a) factors supports that conclusion: a downward variance is necessary for the sentence imposed on Mr. Rosales-Jimenez to be "sufficient, but not greater than necessary,' to accomplish the goals of sentencing." 18 U.S.C. § 3553(a).

**A. The Nature and Circumstances of the Offense Support a Downward Variance.**

Under section 3553(a)(1), the Court is directed to consider the "the nature and circumstances of the offense." Here, Mr. Rosales-Jimenez sold drugs on two occasions to the UC, and his co-conspirator also sold drugs on two occasions to the UC. This is a serious violation of law, but it is non-violent criminal conduct. No firearms were possessed. The Government stresses that more than a half pound of fentanyl was involved, Gov. Sentencing Memo. at 5, but the drug sales were relatively small, totaling $5,800 between Mr. Rosales-Jimenez and his co-defendant. PSR ¶¶ 9-12.

Mr. Rosales-Jimenez acknowledged to Probation that his conduct was " 'the biggest mistake of [his] life.' " PSR ¶ 16. He has apologized for his offenses and their negative impact on the community and his family, and has resolved that "he will never become involved in similar conduct

in the future." *Id*. A downward variance from the Guidelines Sentence and the Government's high recommendation is warranted.

**B. Considerations of the Seriousness of the Offense, Respect for the Law, and the Need for Deterrence and to Protect the Public from Further Crimes Support a Downward Variance.**

The requested sentence of 24 months' custody appropriately addresses the sentencing factors set out in 18 U.S.C. § 3553(a)(2)(A)-(D). Those sentencing factors require a balancing of considerations so that the sentence reflects the seriousness of the offense, deters criminal conduct, and protects the public, while providing the defendant with needed training and treatment. *See* 18 U.S.C. § 3553(a) & (a)(2)(A)-(D).

First, a sentence with imprisonment reflects the seriousness of the offense and respect for the law, but it need not be lengthy imprisonment to satisfy this sentencing factor. *See* 18 U.S.C. § 3553(a)(2)(A). Here, the Government does not address the real-world consequences and punishment that is being effectively imposed on Mr. Rosales-Jimenez. He will be deported once he completes his sentence. This will most-likely result in the permanent separation of him from his one-year-old son, who he loves dearly, and his common-law wife, as well as from the other members of his Utah adopted family. See PSR ¶ 46; PSR Sentencing Recommendation at ECF p. 21; Declaration of Albert J. Boro, Jr., filed concurrently herewith ("Boro Decl."), at Ex. A (Letter of C. Flores describing the love and attachment between Mr. Rosales-Jimenez and his infant son). These tragic consequences of his conviction militate against a lengthy sentence.

Second, a sentence of 24 months' custody sends a message of deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). It is significant prison time for persons, such as Mr. Rosales-Jimenez, who has never before been in jail and has no prior convictions. The imposition of prison time sends both a message of specific deterrence of criminal conduct by Mr. Rosales-Jimenez, as well as general deterrence to the community, declaring that drug dealing, even non-violent conduct, will result in imprisonment.

Third, the requested sentence is more than sufficient to protect the public from further crimes by Mr. Rosales-Jimenez. *See* 18 U.S.C. § 3553(a)(2)(C). Mr. Rosales-Jimenez has expressed remorse for his criminal conduct and an understanding of the harm he caused to the community and

his family. PSR ¶ 16. Additionally, Mr. Rosales-Jimenez will most surely face immediate deportation to Honduras when he finishes his sentence, further protecting the community. If he were to attempt to reenter the United States without permission, he would face the prospect of a much lengthier prison sentence as a convicted felon who was previously expelled. *See* 8 U.S.C. § 1326(a)(1) & (b)(2) (up to 20 years' custody for illegal reentry after commission of an aggravated felony). Thus, the recommended 24 months' sentence is sufficiently long to protect the public.

Fourth, Congress has directed the Court, in determining the appropriate sentence, to consider how the sentence addresses needed educational/vocational training and treatment, 18 U.S.C. § 3553(a)(2)(D), but because Mr. Rosales-Jimenez illegally entered the United States, a custodial sentence will probably not adequately address these needs. This counsels against a lengthy sentence. Mr. Rosales-Jimenez told Probation that he would like to participate in substance abuse treatment and mental health counseling due to the trauma he suffered when he was kidnapped and tortured on his second attempt to enter the United States. PSR ¶¶ 50 & 52. Probation has recommended that he participate in both types of treatment, if he is supervised here, but recognizes that he will likely be deported. PSR Sentencing Recommendation at ECF p. 22-24. Mr. Rosales-Jimenez is also requesting that the Court recommend that BOP allow him to participate in the RDAP program, but his immigration status may prevent this. Because a custodial sentence holds little prospect for needed substance abuse and mental health treatment for Mr. Rosales-Jimenez, it should not be longer than necessary for purposes of deterrence and instilling respect for the law. A sentence of 24 months, and certainly no more than 32 months, is sufficient for those purposes.

**C. Considerations of Avoiding Unwarranted Sentencing Disparities Support the Requested Sentence of 24 Months' Custody.**

Mr. Rosales-Jimenez's co-defendant was sentenced to 24 months' custody in this case. PSR ¶ 5. The Government correctly notes that the Court should judge each defendant on their unique personal characteristics and acknowledges the hardships and youth of his co-defendant, but it gives short shrift to Mr. Rosales-Jimenez's equally compelling circumstances. *See* Gov. Sentencing Memo. at 6. He too is youthful, 22 at the time of these offenses, and 24 at his arrest. He suffers PTSD-type symptoms from being kidnapped and tortured by a criminal gang and left for dead when it was

determined no one had money to pay his ransom. PSR ¶¶ 41 & 50. He and his brothers were abandoned by his natural parents when he was six years old, and he began working in the fields at that age and only completed school through the fourth grade. PSR ¶¶ 40-44. He scored 9 out of 10 on the self-administered assessment, Adverse Childhood Experiences (ACES) questionnaire, indicating a higher risk for serious disease and health risks. *Id.* ¶ 51.

Mr. Rosales-Jimenez's conduct was similar to that of his co-defendant/co-conspirator and his sentence should be similar. The Government recommended a 24-month sentence for his co-defendant, Gov. Sentencing Memo. at 2 (Dkt. #50), yet here recommends a sentence of 42 months, 75% greater. The Guidelines range for Mr. Rosales-Jimenez is greater because he accepted responsibility for the methamphetamine he sold on August 25, 2022, but his co-conspirator had offered to sell the UC methamphetamine during the June 30, 2022 drug buy, and accompanied Mr. Rosales-Jimenez to the August 25, 2022 drug buy when the methamphetamine was sold. PSR ¶¶ 10 & 12. The Government could have held his co-defendant liable for the methamphetamine sold on an aiding and abetting or a conspiracy theory, but it did not. His and Mr. Rosales-Jimenez's conduct is comparable and does not support such a significant sentencing disparity.

The Government claims Mr. Rosales-Jimenez was "more culpable" than his co-defendant and "was the one arranging the buys." Gov. Sentencing Memo at 6. But both of them made sales to the UC on two occasions during the summer of 2022. The Government's claim that Mr. Rosales-Jimenez arranged the sales and told the UC "he was in control of the telephone number" is wrong.[3] *Id*. at 2, 6. The text messages with the UC for the first sale by Mr. Rosales-Jimenez on June 7, 2022 were in English, PSR ¶ 9, but Mr. Rosales-Jimenez, who is a native Spanish speaker, cannot read and write in English.[4] *See id*. ¶ 53. The text messages for the next three undercover buys were in the Spanish language and clearly written by a different person or persons than the person who sent the English-

---

[3] The Government claims he told the UC he was in control of telephone number (970) 575-2286 during the June 7, 2022 sale, Gov. Sentencing Memo. at 2, but the video of the meeting shows that is merely an assumption by the UC. The relevant passage identified by the defense only states:

UC: "So, so you, you my new"
Rosales-Jimenez: "Yeah"
UC: "You're my new f**k?" (as the UC hands cash to Mr. Rosales-Jimenez). PSR ¶ 9.

[4] Mr. Rosales-Jimenez admitted that he sold the UC drugs after arranging to meet up via text message. Plea Agreement ¶ 2. But that does not mean that he sent the English-language text messages; only that Mr. Rosales-Jimenez and the person texting arranged the meeting with the UC via text messages because he showed up at the location in the texts.

language text messages for the first buy. *See* US-0000144 (spreadsheet showing text messages with the UC and (970) 575-2286 from May 26 to August 25, 2022).

The telephone number (970) 575-2286 was apparently used by persons possibly staying at the residence located on Loma Vista Avenue in Oakland. It seems that at least four people in addition to Mr. Rosales-Jimenez used that telephone number: (1) a prior drug dealer (according to the Government) from at least May 26 to June 1, 2022, who was arrested on June 2, 2022, Gov. Sentencing Memo at 2; PSR ¶ 8; (2) an unidentified person from June 2 to June 13, 2022, who could read and write in English, US-0000144 (spreadsheet with text messages); (3) his co-defendant, who was found with the phone when he was arrested in Colorado on October 19, 2022, US-0001004, at US-0001007; and (4) an unknown male, who was not Mr. Rosales-Jimenez nor his co-defendant, and who answered that phone and spoke with an agent immediately after the August 25, 2022 buy was completed, US-0000108, at US-0000110. Thus, the Government's assumption that Mr. Rosales-Jimenez "control[led]" the telephone number (970) 575-2286 is incorrect and does not support the significant sentencing disparity it seeks.

Finally, the two co-defendants are both Zero-Point Offenders and should not be treated similarly at sentencing. The Government notes Mr. Rosales-Jimenez was arrested by San Francisco police for an alleged drug sale a month before his first sale to the UC, and arrested by Utah local police for an alleged drug sale about 1-1/2 years later, but he was not proven guilty of either offense. PSR ¶¶ 37-38. These events do not justify the 75% sentencing disparity sought by the Government. It is unknown whether his co-defendant was involved in other drug sales, but he took the cell phone with telephone number (970) 575-2286 with him to Denver, Colorado where he was arrested with it in his possession, which could indicate his intent to continue the same conduct after leaving the San Francisco Bay Area.[5] *See* US-0001004, at US-0001007. All of this is to say that the conduct of the two co-defendants is substantially similar, and it is contrary to the sentencing factor on avoiding unwarranted disparities to sentence Mr. Rosales-Jimenez to 42 months when his co-defendant was only sentenced to 24 months.

---

[5] The Government stretches further to differentiate Mr. Rosales-Jimenez from his co-defendant, asserting that the Utah arrest shows his methods became more sophisticated supposedly because he was using "fake aliases," having supposedly identified himself to an informant as "Max." Gov. Sentencing Memo. at 6. However, the Government admits that in the June 7, 2022 sale he told the UC his name was "Marks," again not his actual name. PSR ¶ 9.

**D. Mr. Rosales-Jimenez's Personal History of Poverty and Abandonment, and His Victimization, Substance Abuse, and Youthfulness, and His Good Character, All Support a Significant Downward Variance.**

The sentencing factors of the "history and characteristics of the defendant" support a significant downward variance. *See* 18 U.S.C. § 3553(a)(1). Mr. Rosales-Jimenez is only 25 years old but has had a very tough life. He grew up in poverty in the poor village of Agua Caliente in the Department of Francisco Morazán in Honduras. PSR ¶ 40. His father was an alcoholic and abusive and left his mother, who was unable to financially support the children and abandoned Mr. Rosales-Jimenez at age 6 with his two younger brothers. *Id.* ¶ 42. Another couple in the town took them in, and he began working in the agricultural fields at age 6 with his adoptive father to help support the family. *Id.* ¶ 43. He often did not have enough food to eat, and the small two-room house had no electricity or running water. *Id.* ¶ 42. He only attended school through the fourth grade. *Id.* ¶ 53.

Mr. Rosales-Jimenez is a victim of violent crime. He witnessed gang violence in his local town and had to flee to a neighboring village to avoid being recruited into the gang. *Id.* ¶44. He was a victim of criminal violence when he was kidnapped by a gang in Mexico from a train he was riding north to immigrate to the United States, and held for ransom, and then tortured and left for dead when it became clear there was no money to pay a ransom. *Id.* 41. His persistence in attempting to immigrate to the United States is a reflection of the desperate poverty and criminal conditions in Honduras he was trying to escape from but now will be returned to. His poverty, lack of education, and victimization by gangs are mitigating factors that counsel against a lengthy prison sentence for his non-violent criminal conduct.

Mr. Rosales-Jimenez also has substance abuse problems, which make his participation in selling drugs more likely to support his drug use. He was traumatized by his kidnapping in Mexico, and his mind will sometimes go blank, but he has received no mental health counseling. PSR ¶ 50. Following the kidnapping he began drinking alcohol at times to help him sleep, and he began using cocaine. *Id.* ¶ 52. He would like to receive substance abuse treatment. *Id.* His trauma from violent gang crime and personal drug use contributed to his decision to sell drugs, and the Court should take these personal characteristics in account and show leniency.

Mr. Rosales-Jimenez's youth at the time of these crimes also supports a downward variance under 18 U.S.C. § 3553(a). He was only 22 years old during the events charged in the Superseding Information and was only 24 years old when he was arrested. During the time he was in the San Francisco Bay Area, he was homeless and stayed at various places, including the Loma Vista Avenue apartment that other Hondurans resided at and were expected to deal drugs to pay for rent. He got involved in these crimes because he was " 'hanging out with the wrong friends' [who] influenced him to become involved in the offense." PSR ¶ 16. He only went to school until the fourth grade and began working in the agricultural fields at age 6. *Id*. at ¶¶ 43 & 53. His destitute poverty and limited education are important considerations in sentencing him for the crimes he committed while still an immature young adult.

The Supreme Court has recognized that " '[i]mmaturity at the time of the offense conduct is not an inconsequential consideration. Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five. . . . While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant.' " *Gall v. United States*, 552 U.S. 38, 58 (2007). Also, " '[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.' " *Roper v. Simmons*, 543 U.S. 551, 570 (2005) (quoting *Johnson v. Texas*, 509 U.S. 350, 368 (1993)). Here, Mr. Rosales-Jimenez's conduct speaks to the impetuousness and recklessness of youth, and an attempt to flee poverty and criminal gangs, but the immaturity that contributed to his bad decisionmaking can be grown out of. His lack of a criminal record supports that he does not pose a risk to society, and lengthy imprisonment is not necessary to protect the community.

The letters of support from his adopted mothers in Honduras and Utah show that he is a young man with a kind and helpful personality. Mr. Rosales has remained in contact with Honduran and Utah families during his incarceration and has their support. PSR ¶ 47. His Honduran adopted mother speaks of how she took in Mr. Rosales-Jimenez and his two younger brothers, after his mother, who she knew, abandoned them. Boro Decl. Ex. A (Letter of M. Suazo).

She describes him as hardworking and honest and that he came to the United States in search of work to help support his family at home. *Id*. She says he, as well as the other members of his adopted family in Honduras, are "humble people, simple and kind[-]hearted." *Id*. His Utah adopted mother similarly describes him as a "very respectful and helpful young man." *Id*. (Letter of C. Flores). She says he is like a son and is viewed as a grandson by her parents, a partner to her niece, who lives with them, and a best friend of her biological son. *Id*. She describes Mr. Rosales-Jimenez's infant son's attachment to him, saying he "knew his voice before he was born," and that Mr. Rosales-Jimenez was "an amazing father." *Id*.

Finally, two letters have been received from the local community in Honduras, attesting to his good character. One is from a mayor in the Department of Comayagua, Honduras, where the village of Agua Blanca is located, which is a couple of miles across fields and a river from Agua Caliente (but a windy 17-kilometer drive by road through the mountains around the valley). He reports that Mr. Rosales-Jimenez has a reputation in the community of "good conduct." Boro Decl. Ex. A (Record with seal from Mayor M. Euceda Rodriguez). Another is from a local elementary school teacher who also states Mr. Rosales-Jimenez has a reputation in the community of "very good conduct" and is "a serious, responsible, honest person." *Id*. (Letter of M. Ramos Donaire). Consistent with this reputation in the community, Mr. Rosales-Jimenez reported in his PSR interview that he helped out in the local community, assisting with distributing water and repair work to a local church and medical facilities. PSR ¶ 43.

In sum, Mr. Rosales-Jimenez has had an extremely hard life, even at only 25 years of age. He has tried to improve his situation and that of his brothers and has become a loving father. As he admitted in his Plea Agreement, he has made some bad choices, for which he has accepted responsibility and has been serving time in jail, but his youth and the poverty, abandonment by his biological parents, and the gang violence he has endured provide context for his offenses. His personal history and characteristics warrant a downward departure to the requested sentence of 24 months, and certainly no more than the 32 months recommended by Probation.

V. **CONCLUSION**

For the foregoing reasons, Mr. Rosales-Jimenez respectfully submits that the Section 3553(a) sentencing factors, viewed as a whole, support the conclusion that the recommended sentence of 24 months' custody is "a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing." 18 U.S.C. § 3553(a). The sentence should include 3 years of supervised release, if he were not deported. He requests the Court recommend that (1) BOP designate a facility near Salt Lake City, Utah, so that he can have visits by his adopted Utah family, and (2) he participate in BOP's Residential Drug Abuse Treatment Program ("RDAP").

Dated: April 28, 2025

Respectfully Submitted:
BORO LAW FIRM

*/s/ Albert J. Boro, Jr.*
ALBERT J. BORO, JR.
Attorney for Defendant
EBIN ROSALES-JIMENEZ